1  **CARL FABIAN**
   Attorney at Law
2  3232 Fourth Avenue
   San Diego, CA  92103-5702
3  State Bar #112783
   (619) 692-0440
4

   Attorney for:      Petitioner RONALD VERHEGGEN
5

6

FILED

08 JAN -9  PM 1:50

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____  DEPUTY

7

8             IN THE UNITED STATES DISTRICT COURT

9        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

                        -ooOoo-

10  RONALD VERHEGGEN,              )    Case Number
                                   )    08 CV 0052 BEN AJB
11         Petitioner,             )
                                   )    **MEMORANDUM OF AUTHORITIES**
12  vs.                            )    **IN SUPPORT OF PETITION FOR HABEAS**
                                   )    **CORPUS**
13  JAMES E. TILTON, Secretary of  )
    CDCR; and, EDMUND G. BROWN, Jr.,)
14  Attorney General of California )
                                   )
15                                 )
                                   )
16                                 )
           Respondents.            )
17  _____)

18

19         COMES NOW Petitioner RONALD VERHEGGEN, who respectfully submits the

20  following memorandum of authorities in support of his petition for habeas corpus relief:

21                          **INTRODUCTION**

22         In this case Petitioner was arrested in San Diego and was charged under the

23  Three Strikes law with a single offense -- possession of a firearm by a felon (Cal. Penal

24  Code § 12021, subd. (a)).     Petitioner's arrest came on the heels of extensive

25  undercover work for federal authorities in Arizona.  Appellant pled guilty and the trial

26  court gave an indicated sentence that included the striking of both prior convictions

27  (strikes) and sentence was imposed accordingly.  The prosecution filed a petition for a

28  writ of mandate and the California Fourth District Court of Appeal reversed.  The Court

                              1

1   ruled the striking of both priors was not in conformity with the Three Strikes law and

2   directed resentencing. The Court of Appeal expressly stated it was not excluding the

3   possibility that the striking of a single strike could result in a proper sentence. (*People*

4   *v. Superior Court (Verheggen)* (July 20, 2004, D043302) [non. pub. opn], p. 16, fn. 3.)

5      At resentencing Petitioner requested the trial court to dismiss one of his two

6   strike prior convictions, based, in part, upon Petitioner's extensive undercover work and

7   cooperation with law enforcement over many years.[1]  His work involved both state and

8   federal law enforcement authorities.[2]  (R.T. pp. 48-53.)[3]

9      The trial court refused.  The trial court stated it did not believe it had authority

10  to strike a prior conviction based upon a defendant's cooperation with law enforcement,

11  regardless of how extensive the cooperation and without regard to how much benefit

12  that cooperation was to society.  By way of example, the trial court concluded it lacked

13

14  [1]  Petitioner's cooperation and undercover work included:

15      1) the arrests and prosecution of a large number of Hell's Angels gang members
    in Arizona in a large scale weapons case (this work was performed prior to his arrest
16  in this case)  (R.T. pp. 43-44.);

17      2) the discovery of the largest skinhead gang in southern California (which law
    enforcement was previously unaware of) and the arrest and prosecution of its members
    in a large scale check manufacturing case involving hundreds of open cases of check
18  fraud; along with the arrest of a dangerous fugitive whom law enforcement had been
    unable to locate despite repeated efforts, and were able to arrest only after Petitioner
19  provided information on the fugitive's whereabouts.  (R.T. pp. 38-39.);

20      3) the foiling of a plot to assassinate the sheriff of Maricopa county in a murder-
    for-hire plot.  (R.T. pp. 28, 40.);

21      4) information on two permanent crystal methamphetamine laboratories with
    mobile capabilities that had been previously been unknown to law enforcement.  (R.T.
22  p. 14.);

23      5) work on an additional case with law enforcement that was too sensitive to be
    discussed, even in closed court proceedings.  (R.T. p. 33.); and,

24      6) work on an additional case for federal authorities that was not identified or
    discussed in testimony.  (R.T. pp. 72-73; 79-80.)

25

26  [2]  Petitioner worked for ATF and FBI as well as state authorities.  Petitioner also
    provided assistance to an agent employed by the California Department of Justice but
    was also dual designated as an agent with the Federal Drug Enforcement agency.  (R.T.
27  pp. 11, 45.)

28  [3]  "R.T." and "C.T." refer to the single volumes of the reporter's and clerk's
    transcript from Petitioner's direct appeal.

the power to strike a prior based upon the benefit provided by Petitioner in this case, even if the benefit provided by Petitioner had included the solving of arguably the most notorious crime in modern history -- the murder of a United States president, John F. Kennedy, in 1963.  (R.T. p. 85.)

The trial court refused to consider Petitioner's cooperation efforts and the extent of the benefit he provided society and that decision resulted in a manifest injustice. Petitioner's life has been permanently altered by his undercover work with law enforcement agencies as he is now the target of organized crime, whether he resides inside or outside of prison.  The trial court's decision has resulted in the imposition of a sentence of 25 years to life in prison, versus a sentence of six years if one strike had been ordered stricken.

Petitioner appealed his sentence and the Fourth District affirmed.  The Court of Appeal concluded the trial court's comments did not reflect an erroneous belief that cooperation with law enforcement could not be considered in deciding whether to strike a prior conviction; rather the trial judge was merely correctly stating the law that cooperation is a proper factor within the confines of the established guidelines for striking priors; i.e., whether the cooperation reflected positively on Petitioner's character, background and prospects.  (*People v. Verheggen* (June 28, 2004, D046077) [non. pub. opn], p. 8.)

With respect to the trial court's exercise of discretion in refusing to strike any priors, the court of appeal concluded the trial court acted properly.  Without citation to authority, the state appellate court held the trial court's conclusion that Petitioner's acts of cooperation were not reflective of good character was supported by the record. (*People v. Verheggen* (June 28, 2004, D046077) [non. pub. opn], p. 12.)

Petitioner contends the state courts engaged in an unreasonable determination of the facts in light of the evidence presented at the sentencing hearing and clearly misapplied state law resulting in a denial of due process under clearly established federal statutory law and United States Supreme Court decisional authority.  Petitioner

1 | further contends the trial court misunderstood the scope of its sentencing discretion as
2 | reflected in its comments that no degree of cooperation could be a circumstance
3 | warranting striking a strike; and the ruling of the court of appeal finding the trial court
4 | did not misapprehend the scope of its discretion was a clear misapplication of state law
5 | and further resulted in a denial of due process.

6 | There is no case law in California prohibiting cooperation with law enforcement
7 | as a proper basis for striking prior convictions.[4]  In contrast, federal law has very
8 | explicit statutory and case law authority which delineates precisely how a defendant's
9 | cooperation may be considered at sentencing and the scope of leniency which may be
10 | extended in return. (U.S. Sentencing Guidelines, § 5K1.1; 8 U.S.C.A. § 3553(e); Fed.
11 | Rules of Criminal Procedure 35(b)(2)(A).)

12 | Even if consideration of Petitioner's undercover work and cooperation efforts are
13 | restricted to the confines of the California Supreme Court's prior holdings in cases such
14 | as *Romero*[5] and *Williams*[6], the trial court nevertheless erred in failing to find
15 | Petitioner's cooperation efforts were evidence that he fell outside the scope of the
16 | Three Strikes sentencing scheme within the meaning of *Williams* and *Romero*. (*People*
17 | *v. Carmony* (2004) 33 Cal.4th 367, 377.)

18 | In support of Petitioner's claims that his cooperation efforts were part of a desire
19 | to benefit society and atone for some of the wrongs of his past criminal conduct (e.g.,
20 | his strikes), Petitioner presented the testimony of two of the law enforcement
21 | individuals he worked with. Both men testified they believed Petitioner's motivation for
22 | risking his life while working undercover for law enforcement was because he had

---

[4]  The lone case from the California Supreme Court addressing cooperation in a Three Strikes case involved a defendant who cooperated with police regarding his own prosecution, in hopes of leniency. (*People v. Garcia* (1999) 20 Cal.4th 490.)  Although similar in concept, the facts of *Garcia* are markedly different than here, where Petitioner engaged in extremely dangerous undercover work with no expectation of benefit in addition to pleading guilty prior to trial.

[5]  *People v. Romero* (1996) 13 Cal.4th 496.

[6]  *People v. Williams* (1998) 17 Cal.4th 148.

4

reformed.  (R.T. pp. 23-24, 42, 44.)  Petitioner never demanded any payment from these officials, and in fact, had refused an offer of payment.  (R.T. p. 19.)[7]

Petitioner provided the testimony of a 31-year law enforcement veteran, Detective Duitz, who testified Petitioner never sought any favors for his extensive cooperation efforts and, in Detective Duitz's opinion, performed these services out of a sense of civic duty.  (R.T. p. 44.)  Petitioner had told detective Duitz essentially the same thing he told agent Aguirre with regard to his motive for working undercover, i.e., he wanted to be on the right side of the law.  (R.T. pp. 23-24, 42.)  Detective Duitz reported Petitioner was leading a non-criminal lifestyle at the time he was recruited to infiltrate the Hell's Angels.  (R.T. p. 43.)[8]

Petitioner also presented the testimony of Robert Aguirre, a special agent with the Department of Justice working in narcotic enforcement, who testified Petitioner had turned down an offer of money for his services, explaining: "Hey, that's not the reason why I'm doing this."  Aguirre testified: "[Petitioner] said he had been on the bad side of law long enough and that he wanted to come over to the good side."  (R.T. pp. 19, 23-24.)

The trial court, however, rejected this evidence and found Petitioner's cooperation efforts were not motivated by Petitioner's desire to benefit society nor to right the wrongs of his past, but instead were performed because "it has let him continue to be involved with criminal elements and indeed to commit crimes."  (R.T. p. 88.)  As opposed to cooperating for laudable motives, the court found Petitioner has "engaged in and continues to engage in [cooperation] as a way of life," and not "as a sign of reformation in any sense."  (R.T. p. 88.)  Petitioner has "abused rather than

---

[7]  In working with other law enforcement officials in Arizona prior to his arrest in this case, money was paid to Petitioner's ex-wife who was also involved in that case. (R.T. pp. 44-45.)

[8]  In argument counsel represented Petitioner had told him: "I want the pain to stop, Bill.  I have hurt people.  And I don't want to ever hurt anybody.  And I need to make amends for this.  I need this to stop.  And I'm going to work so that it stops."  (R.T. p. 49.)

1  used" his cooperation to benefit himself.  (R.T. p. 89.)  This conclusion of the judge

2  was apparently based upon a negative view of Petitioner expressed in a probation report

3  prepared prior to the initial sentencing hearing on September 30, 2003.  (R.T. pp. 88-

4  89.)[9]

5  **Other Mitigating Factors**

6    In addition to Petitioner's cooperation efforts there was an offer of proof that

7  Petitioner was granted permission to carry a gun -- the offense for which Petitioner was

8  sentenced.  (R.T. p. 50.)  All of Petitioner's offenses occurred within a relatively short

9  period of time (less than 1 year) and an examination of the facts of the strike offenses

10  shows that while Petitioner was apparently armed (hence the strikes), he did not point

11  a gun at anyone, and in at least one of the two bank robberies apologized to the bank

12  clerk for the robbery.  (Petition, p. 81.)[10]

13    In *People v. Carmony* (2004) 33 Cal.4th 367 the California Supreme Court held

14  that when a sentencing decision involving the exercise of discretion and is based upon

15  factors unsupported by the record on appeal ("impermissible factors"), the decision is

16  necessarily an abuse of discretion.  (*Id.* at p. 378.)  Thus, Petitioner's case falls

17  squarely within this category and Petitioner was denied due process.

18

19  **STATEMENT OF THE FACTS**

20  **Crime Facts**

21    Petitioner was engaged in a confrontation with another man a bar in San Diego.

22  Petitioner retrieved an unloaded gun from his car and held it at his side, causing the

23  other man to retreat.

24

25

---

26   [9] The court acknowledged that this probation report was written prior to

27  Petitioner's subsequent cooperation efforts. (R.T. p. 89.) The court of appeal held the trial court's finding was supported by the record on appeal. (Slip Opn. p. 12.)

28   [10]"Petition" refers to the petition for writ of mandate filed by the prosecution in D043302.

1    **Evidence Admitted at the Resentencing Hearing**

2    Special Agent Aguirre

3        Agent Aguirre had been a special agent with the Department of Justice, Bureau

4    of Narcotic Enforcement, since 1990. (R.T. pp. 10-11.) He was assigned to the Drug

5    Enforcement Agency. (R.T. p. 11.)

6        Agent Aguirre was first contacted by another cooperating individual who

7    conveyed the fact that Petitioner had information he could also provide to agent

8    Aguirre. (R.T. p. 16.) In the initial conversation the only benefit Petitioner sought was

9    that his information would be credited to the other cooperating individual. (R.T. p. 17.)

10       Agent Aguirre first met Petitioner 10 months earlier (agent Aguirre's testimony

11   was provided in January of 2005). (R.T. p. 12.) At that time Petitioner was in federal

12   custody.[11]  During the previous 10 months Petitioner had been working with agent

13   Aguirre, providing confidential information. (R.T. p. 12.) The information had "great

14   potential" according to agent Aguirre. (R.T. p. 12.) Petitioner provided the cooperation

15   without any promise of leniency or any "deals," and had turned down an offer of money

16   from Aguirre. (R.T. pp. 12, 19.)

17       Agent Aguirre appeared at the sentencing hearing pursuant to a subpena. When

18   asked whether he was discouraged from testifying unless subpoenaed, agent Aguirre

19   testified he was "reminded as to my position as a special agent." (R.T. p. 13.) The

20   trial court understood this response to mean agent Aguirre testified on Petitioner's

21   behalf as a result of agent Aguirre's independent decision, and "even at the risk of

22   official agency displeasure." (R.T. p. 87.)

23       Petitioner initially provided information about two permanent methamphetamine

24   laboratories with moveable capabilities. (R.T. p. 14.)[12]  During the time agent Aguirre

25

26       [11] Petitioner was in federal custody based upon a revocation of his federal probation
27   in a case involving possession of a firearm by a felon from 2000. (C.T. pp. 21, 22.)

28       [12] Petitioner knew of the labs because he had welded two containers which he was
     led to believe would be buried and used to store chemicals in the manufacturing
     process. (R.T. pp. 22-23.)

worked with Petitioner agent Aguirre was unaware of the pendency of the prior appeal or that Petitioner faced the prospect of being resentenced under the Three Strikes law to 25 years to life in state prison. (R.T. p. 15.)  Agent Aguirre testified Petitioner cooperated without reservation. (R.T. p. 15.)

Despite the fact Petitioner's case was ordered sent back for resentencing, Petitioner never mentioned this fact to agent Aguirre. (R.T. p. 17.)[13]

Detective Duitz

Detective Duitz was a member of the San Diego police force for the previous 31 years; the last five in the criminal intelligence unit. (R.T. p. 27.)  His job was to investigate motorcycle gangs and white supremacy groups in San Diego. (R.T. p. 32.)

Like special agent Aguirre, detective Duitz was discouraged from appearing and testifying on Petitioner's behalf by his superiors. (R.T. p. 26.) The reason he was given for this position was that the district attorney "would be upset about it." (R.T. pp. 26-27.) In addition, the policies of the department had recently changed which prohibited testimony on behalf of an informant. (R.T. p. 27.)

Over the past five years detective Duitz had worked with many informants; some had very useful information others provided very little assistance. (R.T. p. 27.)

Detective Duitz first met Petitioner in October of 2002, shortly after his arrest for the instant offense. (R.T. p. 28.)[14] Since that date detective Duitz had met with or spoken to Petitioner approximately 100 times. (R.T. p. 28.) Petitioner had been a "very valuable source of information" for the police, although he was never signed up as an informant. (R.T. p. 28.)

**Cooperation Before this Case**

Prior to Petitioner's arrest in this case he worked as an informant for the FBI. He infiltrated a chapter of the Hell's Angels in Arizona. As a result of his efforts numerous

---

[13]    The court of appeal ordered Petitioner to be resentenced by decision filed June 20, 2004. (Slip Opn D043302, p. 1.)

[14]    The offense date was October 23, 2002. (C.T. p. 1.)

individuals were arrested and prosecuted, including the vice president of one chapter of the Hell's Angels.  Petitioner was then sent to San Diego to relocate when this incident occurred.  (R.T. pp. 43-44.)

**Cooperation After this Case**

After Petitioner was initially sentenced in this case (and prior to reversal of that sentence by the court of appeal), Petitioner assisted authorities in a murder-for-hire investigation in Arizona while in federal custody.

While incarcerated in San Diego Petitioner provided information of "high value" to law enforcement about a group of "very sophisticated skinheads" that police were unaware even existed.  Petitioner provided ongoing information about the group from jail after he was housed with the leader of that group.  (R.T. p. 32.)  Petitioner was not paid for this information, although detective Duitz did put money on Petitioner's books for phone calls.  (R.T. p. 33.)  Petitioner's information led to the breakup of a "huge financial crimes ring" of skinheads who produced their own checks and cashed them at stores.  (R.T. p. 38.)

In addition, Petitioner was instrumental in coaxing a fugitive to return from New Mexico to Arizona where he was arrested.  Detective Duitz provided a phone to Petitioner in the jail so Petitioner could speak directly to the fugitive.  (R.T. p. 39.)

Finally, at the time of the sentencing hearing Petitioner was still providing information on two on-going investigations.  The subject of one investigation was sufficiently sensitive it could not be discussed further even in closed proceedings.  (R.T. p. 33.)  The other investigation was not part of testimony, but was disclosed by the prosecutor after the law enforcement witnesses testified.  (R.T. pp. 72-73, 79-80.)

If released and Petitioner was not extremely careful, "without a doubt the Hell's Angels would try to terminate his life."  (R.T. p. 41.)

## ARGUMENT

### I.

**IN REFUSING TO STRIKE ONE OF PETITIONER'S PRIOR CONVICTION STRIKES THE STATE COURTS MADE AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED AT THE SENTENCING HEARING AND MISAPPLIED STATE LAW, RESULTING IN A DENIAL OF DUE PROCESS TO PETITIONER.**

Petitioner was sentenced under the Three Strikes law to 25 years to life for his offense of possession of a firearm by a felon. Petitioner's criminal history consisted of two strike prior convictions [2 federal bank robbery convictions prosecuted under a single case] and five other felony convictions [3 felonies which involved check fraud and 2 felonies for possession of a firearm by a felon], for a total of seven felonies (counting the instant offense for possession of a firearm by a felon). (Petition, pp. 144-147.)

Five of the seven felonies (the 2 bank robberies and the 3 check crimes) were likely committed between October 8, 1990 and March 15, 1991. (Petition, pp. 144-146.)[15] The sixth felony, possession of a firearm by a felon (prosecuted in federal court in Arizona), was committed in 2000. The record is unclear as to whether Petitioner had commenced his undercover work for the FBI at the time of this offense. (R.T. p. 43.)

The seventh felony is the instant offense. The facts of this crime involved Petitioner's display of a firearm after a confrontation instigated by a member of a rival motorcycle gang. In committing that offense Petitioner took steps to ensure the gun

---

[15] As noted *ante*, the probation report identifies one of the check felonies, CR92-1812, as having been committed on August 20, 1992. (Petition, p. 146.) However, this information cannot be correct in light of Petitioner's continuous incarceration in federal custody from March 20, 1991 until October 2, 1995 on case CR91-00290-JMI. (Petition, p. 76 [federal prison inmate log]; p. 145.) The federal prison inmate log shows that on August 20, 1992 Petitioner was released to state custody on a detainer. (Petition, p. 76.) Thus, August 20, 1992 is the filing date for that case, but clearly not the offense date as represented by the probation officer. Finally, the offense involved a NSF check for furniture; a crime which would not take place while one is incarcerated. (Petition, p. 146.)

1  was not loaded; and at no time did he point the weapon at any individual but instead

2  kept it down at his side briefly and then placed it in the rear waistband of his pants

3  before he was within 25 feet of the other man. (Petition, p. 41.)

4       Moreover, Petitioner reported he was granted permission to carry a firearm by a

5  federal judge as part of his informant work for law enforcement. Petitioner claimed that

6  he permitted to carry a firearm "for protection and other reasons" until five days prior

7  to this incident. (Petition, p. 135.)  Additionally, at sentencing trial counsel made an

8  offer of proof that Petitioner had been instructed to carry the gun as part of his role in

9  the undercover operation. (R.T. p. 50.)  At that time Petitioner was completing work

10  on the large-scale criminal case involving the Hell's Angels motorcycle gang in Arizona

11  related to weapons offenses.

12       In addition to these facts regarding Petitioner's criminal history, Petitioner was

13  deserving of leniency because of the extremely dangerous and beneficial services he

14  performed for law enforcement for several years, without any payment or expectation

15  of benefit, other than payments made in one case to his ex-wife, who was also involved

16  in that case.  Petitioner continued his work for law enforcement after he was initially

17  given a suspended sentence and granted probation in this case and released with credit

18  for time served.  Petitioner again continued to work for law enforcement after that

19  sentence was subsequently set aside by the court of appeal in June of 2004.

20       Petitioner's work as an informant produced prodigious results and provided a

21  tremendous benefit to society and law enforcement.  A summary of some of those

22  efforts included:

23       1) the arrests and prosecution of a large number of Hell's Angels gang members

24  in Arizona in a large scale weapons case investigated by the FBI (Petitioner's

25  cooperation efforts in that case were completed prior to his arrest in this case). (R.T.

26  pp. 31-32.);

27       2) the discovery of the largest skinhead gang in southern California (which law

28  enforcement was previously unaware of) and the arrest and prosecution of its members

1    in a large scale check manufacturing case involving hundreds of open cases of check

2    fraud; along with the arrest of an armed and dangerous fugitive whom law enforcement

3    had been unable to locate despite repeated efforts, and were able to arrest only after

4    Petitioner provided the fugitive's location to law enforcement; (Petition, pp. 118-119;

5    R.T. pp. 32, 38-39.)

6         3) the thwarting of a plot to assassinate the sheriff of Maricopa county (Joe

7    Arpayo) in a murder-for-hire scheme that required Petitioner to wear a wire for two

8    weeks while incarcerated in an Arizona jail. (R.T. pp. 29, 40.);

9         4) information on two permanent crystal methamphetamine laboratories with

10   moveable capabilities that had been previously been unknown to law enforcement.

11   (R.T. pp. 14-15.)

12        5) work an additional case with state authorities that was too sensitive to be

13   discussed even in closed court proceedings. (R.T. p. 33.); and,

14        6) a separate case for federal authorities that was not identified or discussed in

15   testimony, but acknowledged by the prosecution at sentencing. (R.T. pp. 72-73, 79-

16   80.)

17        Law enforcement individuals testified that after the initial weapons case for

18   which he was recruited by the FBI and paid as an undercover informant, Petitioner did

19   not seek any money or other benefit for his other work for law enforcement. On the

20   contrary, in one case Petitioner requested that another individual receive the credit for

21   his work. (R.T. p. 17.)  Agent Aguirre testified that when he offered money to

22   Petitioner he refused. (R.T. p. 19.)

23        The trial court received evidence that highly trained and well-seasoned law

24   enforcement veterans believed Petitioner provided assistance because of a change of

25   character. The state courts arbitrarily disregarded the opinions of these two extremely

26   experienced and well-trained law enforcement officers, who had worked first-hand with

27   Petitioner and were in the best position to judge his motivation for cooperation. This

28   constituted a denial of due process and the instant request for habeas relief should be

12

granted.

## A.  The Exercise of *Romero* Discretion As Recently Interpreted by the California Supreme Court.

Judicial discretion in the context of sentencing discretion has been defined and described in *People v. Surplice* (1962) 203 Cal.App.2d 784, 791. The general question facing a trial judge is whether the defendant should be deemed to be outside the Three Strikes scheme, in whole or in part. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) In making that decision the relevant inquiry is the nature and circumstances of the current offense and the defendant's strikes; his background, character and prospects. (*Ibid*.)

Recently the California Supreme Court further defined appellate review of a trial court's discretion in deciding whether to dismiss a strike: "[A] court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* ["*Carmony*"] (2004) 33 Cal.4th 367, 371.) In *Carmony* the California Supreme Court reiterated its previous holding in *People v. Williams, supra*, 17 Cal.4th 148, and held trial courts must apply a "stringent standard" for deciding when to dismiss a strike. (*Id*. at p. 377.)

Based upon this guideline, the California Supreme Court concluded it will be presumed that the imposition of a Three Strikes sentence was "both rational and proper." (*Id*. at p. 378.) The California Supreme Court noted that because the circumstances must be extraordinary by which a "career criminal" falls outside the spirit of the Three Strikes law, the circumstances must be even more extraordinary where no reasonable people could disagree that he falls outside the spirit of that law. (*Id*. at p. 376.)

However, the California Supreme Court also described the circumstances when an abuse of discretion occurs and reversal is necessitated. Under such circumstances, "'[w]hen the balance falls clearly in favor of the defendant, a trial court not only may *but should* exercise the powers granted to him by the Legislature and grant a dismissal in the interests of justice.' (*People v. Superior Court (Howard)* 69 Cal.2d 491, 505,

1  italics added.)" (*Carmony*, at p. 375, emphasis in original.)

2  **B.  The Facts and Circumstances of Petitioner's Case Demonstrate the Trial**
3  **Court Abused Its Discretion in Refusing to Strike One of Petitioner's**
   **Strikes.**

4  **1.  Facts of Present Offense**

5  The trial court concluded the circumstances of the instant offense do not show

6  conduct outside the purview of the Three Strikes law; instead the circumstances show

7  conduct which the Three Strikes law was intended to address: "[Petitioner] did what

8  one might say bikers tend to do, and, that is, he came here [from Arizona], and he got

9  in a bar fight over his girlfriend, and he brought out a gun...I think that the

10 circumstances of the present offense put [Petitioner] squarely within the kind of

11 conduct that the Three Strikes sentencing scheme is intended to address."  (R.T.

12 p. 84.) Petitioner respectfully disagrees with the conclusion reached by the trial court.

13 The circumstances are far more unique than in any of the published cases addressing

14 the exercise of discretion. Here Petitioner was working as an undercover informant and

15 in the course of those duties apparently was directed to carry a gun by law

16 enforcement as part of his undercover activities. (R.T. p. 50; see also, Petition, p. 135

17 [Petitioner reported to probation officer he had been granted permission of a federal

18 judge to possess a gun as part of his activities].)  While this is not to say Petitioner had

19 a defense to the charge, but it does present circumstances that are unique while not

20 amounting to a defense. (Rule 4.423(a)(4); R.T. p. 86: Trial court acknowledged there

21 was conflicting evidence as to whether Petitioner was led to believe he could possess

22 the gun by the federal agent he was working with at the time].)

23 **2.  Nature and Circumstances of the Priors**

24 The trial court found that because Petitioner's strikes involved Petitioner pleading

25 guilty to two armed bank robberies in exchange for dismissal of two others, these are

26 the kinds of prior convictions the Three Strikes law "is intended to address."  (R.T.

27 p. 85.)

28 However, such a finding is tantamount to a finding that Petitioner qualifies for

14

1  the Three Strikes law in the first instance.  The trial court's finding on this factor as a

2  basis to deny Petitioner's application to have one strike dismissed is almost identical to

3  the facts in *People v. Cluff* (2001) 87 Cal.App.4th 991.  In that case the court of

4  appeal found it was improper for the trial court to consider defendant's failure to

5  register as a fact justifying denial of his application to dismiss a strike, because that

6  was no more than a finding the defendant was guilty of the crime he was charged with

7  committing.  (At p. 1004.)

8      The same applies here.  Petitioner's two prior robberies are precisely that which

9  qualify him for a Three Strikes sentence, and it would inappropriate for those two priors

10 be to found to prevent Petitioner from being determined to be outside the intent of that

11 law.  Moreover, an examination of the facts of the offenses shows that while Petitioner

12 was apparently armed (hence the strikes), he did not point a gun at anyone, and in at

13 least one of the two bank robberies apologized to the bank clerk for the robbery.

14 (Petition, p. 81.)

15     In the context of discretion to reduce a charge to a misdemeanor with two

16 serious or violent felony prior convictions the California Supreme Court held the trial

17 court may not deny such a motion simply on the basis that it would defeat the purpose

18 of the Three Strikes to ensure longer sentences.  Such a policy would be tantamount

19 to holding sentencing courts have no discretion.  (*People v. Superior Court (Alvarez)*

20 (1997) 14 Cal.4th 968, 979.)

21     That is akin to what the trial court's finding was with regard to Petitioner's

22 priors.  What the trial court did not note is that all but one of Petitioner's prior

23 convictions occurred within a span of a few months.  After he completed his five-year

24 prison term in 1995, he did not have another offense until his arrest for possession of

25 a firearm in 2000, under circumstances where the gun was not being used by

26 Petitioner.  Petitioner's record is a far cry from the facts in *Williams* and *Carmony*,

27 where the defendants had virtually been in prison continuously.

28

### 3.    Petitioner's Background, Character and Prospects

The trial court found Petitioner had a long history of drug use and [alcohol] abuse. The court again noted Petitioner's criminal history and the facts of the instant offense. (R.T. p. 86.) The court concluded that "but for [Petitioner's] cooperation, he would clearly be under the third category within the purview of the Three Strikes law." (R.T. p. 86.) In the court of appeal's prior opinion Petitioner's criminal history was addressed under this category.

As noted in more detail, *ante*, the record demonstrates that five of his six prior convictions all occurred within the span of a few months. The two strikes were committed on February 21, 1991 and March 5, 1991. (C.T. p. 2; Petition, p. 80.) In none of those crimes did he engage in actual violence. There is no record of any offense of Petitioner using actual force or violence, or pointing a weapon at any person. That record stands in sharp contrast to the defendants in *Williams* and *Carmony*, both of whom had strikes involving acts of rape.

Moreover, Petitioner has a trade (a welding certificate) and has worked at that trade. Thus, his prospects for acclimation to society are far greater than an individual who has been incarcerated the majority of his adult life.

### 4.    Cooperation.

The court ruled Petitioner's cooperation did not remove him the scope and purview of the Three Strikes law. (R.T. p. 89.)

The court first held that as a matter of law, cooperation in and of itself is not an independent ground for striking a strike. (R.T. p. 86.) Instead, the court concluded, "it is what that cooperation shows with respect to his character, background and prospects that is important." (R.T. pp. 85-86.) The court then determined Petitioner's cooperation should be divided into two categories: the cooperation before he was originally sentenced in this case in September of 2003 and the cooperation subsequent

1   to that.  (R.T. p. 87.)[16]

2        The court found Petitioner's earlier cooperation was not a factor in mitigation.

3   The court conceded Petitioner's cooperation was on a "great big case, the Hell's Angels

4   case," but because the court erroneously believed Petitioner was paid for his work, the

5   court concluded: "I don't think that cooperation shows anything significantly different

6   about his background, character and prospects."  (R.T. p. 87.)[17]

7        With regard to the latter (post-sentencing) cooperation, the court conceded

8   Petitioner engaged in that cooperation at a time when he did not know his sentence

9   might be overturned.   (R.T. p. 87: "An inference can be drawn thereafter that

10  [Petitioner] was not seeking benefit in that case by cooperating.")   The court

11  acknowledged there was no evidence of any payment to Petitioner or other benefit from

12  this later cooperation. The only benefit Petitioner sought was that the agents promised

13  "his cooperation would be made known."  (R.T. pp. 87-88.)

14       The court also acknowledged that both officers intimated and one agent

15  specifically testified Petitioner had "turned the corner in their opinion, that he had

16  reformed, that he wanted to put this life behind him."  (R.T. p. 88.)

17       The court rejected Petitioner's argument that his cooperation reflected a decision

18  to "burn[] his bridges" such that the criminal lifestyle would be forever unavailable to

19  him again.  (R.T. p. 88.)  The court believed Petitioner cooperated because "it has let

20  him continue to be involved with criminal elements and indeed to commit crimes."

21  (R.T. p. 88.)   As opposed to cooperating for laudable motives, the court found

22  Petitioner has "engaged in and continues to engage in [cooperation] as a way of life,"

23  and not "as a sign of reformation in any sense."  (R.T. p. 88.) Petitioner has "abused

24  rather than used" his cooperation to benefit himself.  (R.T. p. 89.)

25

26  [16] This arbitrary date restriction prevented the trial court from considering a
    significant amount of undercover work and cooperation performed by Petitioner after
27  his arrest in this case in October of 2002.

28  [17] As noted, Petitioner was not paid for his work on that case, but money was paid
    to his ex-wife, who was also involved in that case.  (R.T. pp. 44-45.)

1    The court stated it believed the probation report from September 15, 2003 had

2    the correct analysis at pages 10 and 11. (R.T. pp. 88-89.) There the probation officer

3    said Petitioner had "zero sense of accountability," although the court acknowledged

4    that this probation report was written prior to Petitioner's subsequent cooperation.

5    (R.T. p. 89.)[18]

6    The court's conclusion is not supported by the record on appeal. (*Carmony*, at

7    p. 378.) The trial court arbitrarily refused to consider Petitioner's cooperation between

8    the date of his arrest and the first sentencing hearing, a period of one year when he did

9    extensive work for detective Duitz. The trial court placed reliance on the fact that he

10    believed Petitioner had been paid for his work on the Hell's Angels case, but detective

11    Duitz testified the only money paid was to Petitioner's ex-wife, who was herself

12    involved in the case. (R.T. pp. 44-45.)

13    Further, in reaching its decision regarding Petitioner's motives for his work the

14    trial court utterly and arbitrarily disregarded the testimony of two highly respected law

15    enforcement veterans who expressed their belief that Petitioner's motive for his

16    extensive and extremely dangerous cooperation without renumeration was because he

17    had reformed. (R.T. pp. 23-24, 42, 44.)[19]

18    The trial court found Petitioner continued to commit "additional crimes" after the

19    bank robbery convictions. (Slip Opn. p. 9.) But the only offenses subsequent to the

20    1991 bank robberies are the two cases involving a firearm, the second of which was

21    at a time when Petitioner was told by the FBI to carry a gun. (R.T. p. 50.)

22    Detective Duitz noted Petitioner was not involved in criminal activity when he

23    was recruited by the FBI to become an undercover informant. (R.T. pp. 42-43.) From

24    that point on his life was forever changed. Petitioner did not seek any payment for his

25    services and there was no evidence that he ever refused a request for his services when

26

27    [18] Petitioner was not re-interviewed by the probation officer for the second sentencing hearing.

28    [19] The court did not provide any explanation or findings to support a basis for the decision to reject the testimony of agent Aguirre and detective Duitz.

1   sought by law enforcement.  Indeed, the record shows Petitioner *refused* an offer of

2   payment from agent Aguirre.  (R.T. p. 19.)  He engaged in the most dangerous activity

3   an informant can attempt -- wearing a wire while in jail; and now pays the price for his

4   efforts in the form a contract on his life.

5          Based upon the sacrifices made by Petitioner, the evidence of two credible

6   witnesses that Petitioner had honest motives for his dangerous work, provided without

7   demand or expectation of payment, the trial court abused its discretion in failing to find

8   Petitioner's cooperation to be a circumstance in mitigation.  The court's failure to do

9   so constituted a denial of due process.  (*Hicks v. Oklahoma* (1980) 447 U.S. 343;

10  *Jackson v. Virginia* (1979) 433 U.S. 307; U.S. Const., Amend. XIV.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.

**PETITIONER WAS DENIED DUE PROCESS WHEN THE TRIAL COURT COMMITTED LEGAL ERROR (MISUNDERSTOOD THE SCOPE OF ITS DISCRETION) WHEN IT CONCLUDED PETITIONER'S COOPERATION WITH LAW ENFORCEMENT COULD NOT CONSTITUTE AN INDEPENDENT GROUND FOR STRIKING A STRIKE WITHOUT THE CONCURRENCE OF THE PROSECUTION AND THE STATE COURT OF APPEAL MADE A CLEAR MISAPPLICATION OF STATE LAW IN FAILING TO FIND ERROR.**

One of the principal grounds for Petitioner's application to the trial court to exercise its authority to strike one of Petitioner's strikes was based upon the efforts of Petitioner in assisting law enforcement in the investigation and prosecution of crimes committed by others, including large criminal enterprises and inmates.

The trial court considered this evidence and concluded that as an abstract proposition a benefit from a defendant's cooperation to society or to law enforcement could not provide the requisite circumstances in mitigation to warrant the striking of a strike as a matter of law, absent a motion by the district attorney:

It is this court's conclusion that the court does not have on its own, *absent a motion to do so by the district attorney*, the legal power to dismiss a strike simply because a defendant has provided information of material benefit to law enforcement. In other words, if we assume a case in which a person under the three *Romero* factors is within the spirit of the Three Strikes law such that no strike should be stricken, the court does not have the power to say independently of that analysis, "this person provided information of a substantial benefit to the public, to public safety and to law enforcement, and therefore on that basis the strike will be stricken." The court does not have that power, according to my legal analysis. (R.T. pp. 81-82, emphasis added.)

The trial court's ruling was in error in two respects. The court is incorrect because the California Supreme Court has held sentencing courts should look to the sentencing rules when deciding whether to strike a strike. (*People v. Williams*, 17 Cal.4th at p. 160.) The sentencing rules specifically allow a trial court to consider non-specified criteria in making sentencing decisions. (Rule 4.408(a).) The trial court therefore erred in concluding it lacked authority to rely upon the degree of benefit provided by Petitioner in deciding whether to strike one strike.

The trial court was further incorrect in this ruling because *Romero* specifically found the separation of powers doctrine was not violated by the Three Strikes law only

1    if that law is interpreted to permit a trial court to exercise discretion to strike strikes

2    without constraint by the prosecution. (*Romero,* 13 Cal.4th at p. 516 [legislature may

3    restrict power of court to strike strikes, but cannot condition exercise of discretion to

4    strike strikes on consent of prosecution].)

5        Because the trial court did not recognize it had the power to consider Petitioner's

6    cooperation with authorities as an independent ground for the exercise of *Romero*

7    discretion, the trial court misunderstood the scope of its discretion which is necessarily

8    an abuse of discretion, and reversal and remand are required.

9

**A.    Cooperation with Law Enforcement is a Proper Circumstance Upon Which**
10       **a Trial Court May Base its Decision to Strike a Strike.**

11       No published case has addressed the precise issue presented herein, i.e., the

12   question of whether a defendant's cooperation with law enforcement in the arrest and

13   prosecution of others may be considered as an independent ground for striking a strike

14   based upon the degree of benefit provided by the defendant.    Nor has any case

15   addressed the issue in terms of whether cooperation in and of itself (i.e., without

16   substantial benefit to the public or law enforcement) is a factor in mitigation supporting

17   the exercise of *Romero* discretion.

18       As noted by the court of appeal in the prior appellate opinion regarding this case,

19   the California Supreme Court recognized cooperation with law enforcement as a ground

20   for striking a strike in the context of a defendant who cooperated with police regarding

21   his own crimes. (Slip Opn D043302, pp. 16-17, citing *People v. Garcia* (1999) 20

22   Cal.4th 490, 503.)

23       The court of appeal also noted the nature of Garcia's cooperation was distinct

24   from Petitioner's case, where the cooperation involved the investigation and prosecution

25   of crimes by others.    Garcia's "cooperation" was therefore more akin to the

26   circumstances described in Rule 4.423(b)(3), which recognizes voluntary

27   acknowledgement of wrongdoing at an early stage of the proceedings as a

28   circumstance in mitigation. (See, Slip Opn D043302, p. 17.)

Petitioner submits that because of the California Supreme Court's holding that cooperation with law enforcement in one's own crime is a circumstance in mitigation then it necessarily follows that cooperation in the prosecution of others, especially criminal enterprises, must be both a circumstance in mitigation and one that is qualitatively of greater value. (*People v. Lamb* (1988) 206 Cal.App.3d 397, 401: "Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citations omitted], and may balance them against each other in qualitative as well as quantitative terms.")

In stark contrast to a burglar who is caught red-handed and decides to confess to try to avoid jail, Petitioner agreed to be recruited for life-threatening undercover activity that has left him a target of organized crime. Petitioner's courageous efforts merit far more consideration that a criminal such as Garcia, who was simply too muddle-headed to remember to take his wallet with him when he left the scene of a crime.[20]

While there is little specific authority in California as to how to treat cooperation in the context of sentencing, there is a substantial body of law surrounding the protection of the identity of informants. (See, e.g., Evid. Code, § 1041, et seq.) This is because there is a clear public policy in favor of the use of informants: [¶]"'The common-law privilege of nondisclosure [of the identity of an informer] is based on public policy. "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.'" (*People v. Otte* (1989) 214 Cal.App.3d 1522, 1529; see also *People v. Hobbs* (1994) 7 Cal.4th 948 [public policy encourages

---

[20] A dissenting Justice in *Garcia* referred to Garcia's cooperation with some degree of disdain: "Here, we find defendant's cooperation with police helps to place him outside the spirit of Three Strikes. And what cooperation it was. As to the crimes of which defendant is convicted, there was no doubt of his participation. In the first, he helpfully left his wallet and his driver's license in the rubble. The victim of the second burglary arrived home in time to observe defendant fleeing with her property. Apprehended moments later with the loot, he confessed to additional burglaries, hoping to make a deal to avoid Three Strikes punishment." (*Garcia* at p. 507, dis. opn. of Brown, J.)

protections for informants because of the useful service they provide]; and *People v. Montgomery* (1988) 205 Cal.App.3d 1011, 1019 [noting policy of protecting surveillance locations is akin to policy of protecting identify of informants].)

Because the sentencing rules allow a trial court broad latitude in considering factors in mitigation, and because the California Supreme Court has expressly held the sentencing rules are applicable to the exercise of *Romero* discretion, and in light of the fact that federal courts have several procedures which allow for leniency when a defendant has provided substantial cooperation in the prosecution of others, Petitioner's cooperation in the prosecution of others was a proper factor for the trial court to consider, and specifically the degree of benefit provided by Petitioner's efforts.

**1. The List of Factors in Mitigation Is Not Exclusive, and Substantial Assistance in the Prosecution of Others Is A Proper Ground for Leniency (the Exercise of *Romero* Discretion).**

In *Williams* the California Supreme Court recognized the inherent difficulty in defining and applying the concept of the phrase "interests of justice" as found in section 1385. However vague that concept may be, the California Supreme Court has instructed that sentencing courts should consider the general sentencing rules formulated by the Judicial Council when exercising *Romero* discretion:

> [¶] When we undertake to render Penal Code section 1385(a)'s concept of "furtherance of justice" somewhat more determinate, we may proceed by adopting one of two general orientations. Broadly speaking, we may seek "justice" outside the bounds of the scheme to which the defendant is subject--which here, of course, is the Three Strikes law. Or we may look for "justice" in that scheme's interstices, informed by generally applicable sentencing principles relating to matters such as the defendant's background, character, and prospects. [FN5]
>
> FN5. See, e.g., California Rules of Court, rule 410 et seq.

(*People v. Williams, supra,* 17 Cal.4th at p. 160 and fn. 5.) Within the sentencing rules is Rule 408(a), which requires a sentencing court to consider any criteria reasonably related to the sentencing decision then being made. (Rule 4.408(a): "The enumeration in these rules of some criteria for the making of discretionary sentencing decisions does

1  not prohibit the application of additional criteria reasonably related to the decision being

2  made.  Any such additional criteria shall be stated on the record by the sentencing

3  judge.")

4        The California Supreme Court has held this catchall rule is inextricably linked to

5  the constitutionality of the Determinate Sentencing Law.  (*People v. Black* (2005) 35

6  Cal.4th 1238, 1256, and at fn. 11.)  Without such a provision, sentences would

7  effectively be mandated by the legislature, a circumstance which the United States

8  Supreme Court held unconstitutional in *Blakely v. Washington* (2004) 542 U.S. 296,

9  124 S.Ct. 2531, 159 L.Ed.2d 403 and *United States v. Booker* (2005) --- U.S. ----, 125

10  S.Ct. 738, 160 L.Ed.2d 621.)  (See, *People v. Black, supra*, 25 Cal.4th at p. 1252.)

11        In discussing the relationship between Rule 4.408 and the constitutionality of the

12  Determinate Sentencing Law, the California Supreme Court held:

13        The Legislature did not identify all of the particular facts that could justify
   the upper term. Instead, it afforded the sentencing judge the discretion to

14  decide, with the guidance of rules and statutes, whether the facts of the
   case and the history of the defendant justify the higher sentence. [FN11]

15  Such a system does not diminish the traditional power of the jury.
   [Footnote omitted.]

16

17  FN11. In adopting the sentencing rules, the Judicial Council considered
   and rejected proposals that the rules provide an exclusive list of
   sentencing criteria and that the criteria be assigned specific weights, on

18  the ground that the Legislature intended to give the sentencing judge
   discretion in selecting among the lower, middle, and upper terms.  The

19  report on which the Council acted in adopting the rules explains that *"an*
   *exclusive listing would be inconsistent with the statutory mandate to*

20  *adopt 'rules providing criteria for the consideration of the trial judge' [§*
   *1170.3] since this language does not purport to limit the discretion*

21  *afforded the court in each of the five enumerated sentencing decisions,*
   *but calls for criteria which will assist the courts in the exercise of that*

22  *discretion."* (Judicial Council of Cal., Advisory Com. Rep., Sentencing
   Rules and Sentencing Reporting System (1977) 6.) "Any attempt to

23  impose a weighting system on trial courts ... would be an infringement on
   the sentencing power of the court." (*Id.* at p. 8.) "The substantive law,

24  and section 1170(a)(1), give discretion to the trial court;  the rules can
   guide, but cannot compel, the exercise of that discretion." (*Id.* at p. 11.)

25

26  (*People v. Black, supra*, 35 Cal.4th at p. 1256, and fn. 11, emphasis added; see also,

27  *People v. Covino* (1980) 100 Cal.App.3d 660, 671 [circumstances in Rule 4.423 are

28  illustrative and not exclusive].)

Based upon this very recent authority from the California Supreme Court affirming the principle that the enumerated criteria in the sentencing rules are not exclusive, the facts of (and the quality of) Petitioner's cooperation in the prosecution of others are proper factors for consideration in the decision to strike strikes.

> **2.    Substantial Assistance in the Prosecution of Other Individuals Is A Recognized Basis for a Reduced Sentence in Federal Court and Is a Proper Basis for the Exercise of _Romero_ Discretion in California.**

The law in California has not developed extensively over the years regarding cooperation as a circumstance in mitigation.  In federal court, the landscape is far different.  In federal court there are statutory provisions for the consideration of a defendant's cooperation both prior to and subsequent to sentencing.  (U.S. Sentencing Guidelines, § 5K1.1; 8 U.S.C.A. § 3553(e)[21]; Fed. Rules of Criminal Procedure 35(b)(2)(A) [authorization for motion by the prosecution for the reduction of a cooperating defendant's sentence after sentencing].)

The federal sentencing guidelines provide:

**§ 5K1.1. Substantial Assistance to Authorities (Policy Statement)**

Upon motion of the government[22] stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

(a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

---

[21]  "(e) Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense."  (8 U.S.C.A. § 3553(e).)

[22]  As noted, _ante_, the trial court believed a corollary requirement existed in California that the quality of cooperation provided by a defendant can only be considered by the trial court on motion of the prosecution.  (R.T. pp. 81-82.)

1      (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

2

3      (3) the nature and extent of the defendant's assistance;

4      (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

5      (5) the timeliness of the defendant's assistance.

6  (U.S. Sentencing Guidelines, 5K1.1.) Consideration of these precise circumstances is

7  eminently appropriate in Petitioner's case. Here, two law enforcement employees came

8  to court to testify in Petitioner's behalf despite the fact that they were not encouraged

9  to do so by their superiors.

10      In their testimony they recounted facts which the federal sentencing guidelines

11  specifically allow federal sentencing courts to take into consideration, and which are

12  properly considered in California courts under Rule 408(a). Each of the enumerated

13  factors in section 5K1.1 militates in Petitioner's favor: the information he provided was

14  significant and useful and was highly valued by law enforcement; the information was

15  reliable; Petitioner's assistance was as extensive as possible, with Petitioner working

16  undercover and even wearing a wire while in custody; and, the danger to Petitioner was

17  great in light of the evidence that he has a contract on his life and would likely be killed

18  by organized crime if the opportunity presented itself.

19      Because the record is clear that the trial court felt constrained by the lack of a

20  motion by the prosecution from considering such factors as those found in section

21  5K1.1, the appropriate disposition is remand for a new sentencing hearing. (*People v.*

22  *Rodriguez* (1998) 17 Cal.4th 253, 259-260 [resentencing hearing in Three Strikes cases

23  required when record demonstrates trial court misunderstood scope of its discretion to

24  strike prior convictions]; *Romero*, 13 Cal.4th at p. 530, fn. 13 [same].)

25      Here, the trial court created a clear record demonstrating it did not believe it had

26  any authority to consider Petitioner's cooperation except in terms of whether it

27  demonstrated reformation (a notably amorphous concept), absent a request by the

28  prosecution. It was an abuse of discretion for the court to refuse to consider

1   Petitioner's cooperation with law enforcement in conjunction with Petitioner's

2   application for the trial court to exercise its power under section 1385, and Petitioner

3   is entitled to habeas corpus relief.  The state court's refusal to employ this factor

4   constituted a denial of due process.  (*Hicks v. Oklahoma* (1980) 447 U.S. 343; *Jackson*

5   *v. Virginia* (1979) 433 U.S. 307; U.S. Const., Amend. XIV.)

### CONCLUSION

        Based upon the foregoing, it is respectfully submitted that Petitioner's sentencing
was fundamentally unfair and resulted in a denial of due process as the state courts
made an unreasonable determination of the facts in light of the evidence presented and
clearly misapplied state law.  Accordingly, Petitioner prays for issuance of a writ of
habeas corpus.

                        Respectfully submitted,


Dated: January 8, 2008     _____
                        CARL FABIAN
                        CARL FABIAN, Attorney for
                        Petitioner RONALD VERHEGGEN